YELVERTON, Judge.
Sharon Conner, widow of Roy Conner, sued James R. Savoie, Sheriff of Cameron Parish, and his insurer, Southern American Insurance Company (erroneously named in the caption), for damages for the death of her husband, alleging that a cause in fact of his death was the failure of certain deputy sheriffs to carry out their duty of rescue. The petition alleged that on the night of January 13, 1984, Sharon and her intoxicated husband were at home when he took a bottle of pills; that she called the sheriff’s office for help; that two deputies came but refused to take Roy to the hospital; and that he died later that night from the overdose.
The case was presented to a jury on interrogatories. The jury found in favor of the defendants on the threshold interrogatory, finding that neither the sheriff nor his deputies were negligent in the events leading to the death of Roy Conner. The plaintiff appeals. We affirm.
FACTS
Roy Conner, 34, died in his sleep in his home in the early morning hours of January 14, 1984. According to the coroner, death was caused by a combination of alcohol and the drug Darvon. A laboratory blood concentration analysis showed alcohol of .18 percent, and a urine specimen contained dextropropozyphene, a product of Darvon. The coroner’s estimated time of death was 3:30 A.M.
The events of the hours preceding Conner’s death were thoroughly presented to the jury, and there is surprisingly little dispute about what happened. Roy and Sharon attended the Wildlife & Fur Festival in Cameron on the evening of January 13. Not long before midnight they left to go to their trailer home in the Sweetlake community, Sharon driving. Roy was drunk, according to Sharon. En route home they argued and there was a struggle over the steering wheel.
Sharon went to bed when they got home, but Roy put something to eat in the microwave oven. He then came to her bed and got her attention (she had been faking sleep to avoid further argument). Holding a vial full of pills in one hand and a glass of milk in the other, he said to her, “You’re going to watch this!”, and then he consumed both pills and milk. Tossing the empty pill container into the bedroom, Roy went to the kitchen and ate. He told Sharon to bury him in his blue jeans, otherwise, he would haunt her; after eating, he told her if he died he would die happy because he had a full stomach. He then went to the other bedroom and went to bed.
When the trailer became quiet, Sharon got up and examined the empty bottle, discovered that the label read Darvocet, a pain killer prescribed for Roy in 1982, remembered what the druggist had said then about the danger of drinking and taking that medication at the same time, and became worried. Roy had been drinking heavily daily for months, and he was drunk then. She began making phone calls.
First she called St. Patrick Hospital in Lake Charles. The hospital did not provide ambulance service. Next she called a pharmacist in Cameron, from whom she confirmed the danger of alcohol and Darvocet in combination. She then called Roy’s mother in Cameron, who suggested that she call the law. She did.
The Cameron Sheriff’s Office log shows the call came in at 12:31 A.M. to Deputy Lowery, who wrote down that Sharon Con *992 ner “adv. husband took overdose of pills, had been drinking, was violent.” Deputy Lowery called Deputy Aguillard, who was on patrol in the area, and dispatched him to the scene. Aguillard asked Lowery to call another deputy, Budgie Precht, who lived in the Sweetlake area, to help him. Lowery responded by calling Precht, telling him of Sharon’s call, and dispatching him to join Aguillard.
Precht got there first at 12:40 A.M. Before Aguillard joined him three minutes later, Precht was already in the bedroom, waking Roy. Sharon showed the deputies the empty pill container. Roy woke up when a deputy shook him. He was groggy, still drunk, but responded. At first he denied taking any pills, then admitted that he took only two antibiotics for a cold. He repeatedly denied taking Darvocets. When offered their help to take him to the hospital, Roy refused, saying there was nothing the matter with him. The deputies stayed there 30 minutes. Sharon asked them to take him to the hospital. She asked Roy to go. He refused, indicating there was no reason to go. All four talked in the living room for awhile, then the officers left, telling Sharon as they went that if anything happened, she should call them.
Roy soon went to bed again, and went to sleep. It was 2:30 A.M. Sharon lay beside him awhile, checking his pulse and breathing. Seemingly reassured, sometime before 3:00 A.M. she turned out the light and went to sleep.
A few minutes before 5:00 A.M. Sharon awoke and checked on Roy. He was dead.

The Arguments of Counsel

Using the duty-risk approach, the plaintiff argues the deputies had a duty to protect the deceased from his unwillingness to get treatment. This duty, she says, has a statutory source in La.-R.S. 28:53, which allows a peace officer to take a person suffering from substance abuse into protective custody and transport him to a treatment facility if the officer has reasonable grounds to believe the person is dangerous to himself or to others, is gravely disabled, or is in need of immediate hospitalization. She also argues that, based on the testimony of her expert in police standards, there existed a duty owed by the sheriff and his deputies to at least know what their rights and duties are when confronted with a substance abuse victim who is unwilling to save himself.
Relying on Harris v. Pizza Hut of La., Inc., 455 So.2d 1364 (La.1984), plaintiff urges that there was both a violation of the sheriff’s duty and substandard conduct. The breach of duty was in not taking Roy to the hospital. The substandard conduct was in not knowing they could take him, even against his will, and in not recognizing from the circumstances that he needed to go to the hospital.
Appellant also complains of certain charges to the jury.
Underscoring the appellees’ argument in support of the jury verdict is that, whatever may have been the duty owed by the sheriff’s office and the deputies, and even if there was a breach thereof, the conduct of the deputies was reasonable under all the circumstances, not substandard, and that therefore the jury was correct in not allowing recovery.

Were the Sheriffs Actions Negligent, Substandard or Blameworthy ?

The specific interrogatory answered by the jury, thereby ending the case, was addressed to whether the deputies were negligent. Unless we find manifest error in that determination, we are required to affirm, Canter v. Koehring, 283 So.2d 716 (La.1973), and no purpose would be served in this opinion by addressing the purely theoretical question of whether the sheriff’s department owed the deceased a duty of rescue. Besides, it appears certain from the log entry that at least one reason why the deputies went to Roy’s trailer that night was because of the report that he had taken an overdose of pills. We can assume that they went there to see about him and help him. Having undertaken to help him, they were under a duty to do it right. So whether the law did or did not impose a duty upon them, they undertook such a *993 duty. The ultimate issue, then, is whether their conduct was negligent, substandard, or blameworthy. As stated in Harris v. Pizza Hut of La., Inc., 455 So.2d 1364 (La.1983):
“The inquiry is whether the duty was violated, but there is also a requirement that the breach must be negligent, substandard or blameworthy. The answer to this question is intertwined in the consideration of causation.”
A decision that the deputies (and, through them, the sheriff) were not guilty of negligent, substandard or blameworthy conduct that night, is based upon a review of the totality of the circumstances as reflected by six days of testimony. A review of this testimony causes us to agree with appellant’s argument on two points: (1) the deputies mistakenly believed that they were powerless to take Roy into custody unless he had broken the law, and (2) the deputies were unaware of the authority they possessed pursuant to R.S. 28:53. These facts are the strong points of appellant’s appeal. She asserts that it was this very ignorance, this lack of training, that caused the deputies to make the wrong decision, a decision to leave Roy where he was — and it was this wrong decision that led to Roy’s death.
The argument is a clever one, but it overlooks the ultimate reason why the officers did not force Roy to go to the hospital, or stay with him longer, that night. The ultimate reason was that they were convinced Roy would be all right. Neither ignorance of the law nor a misunderstanding of their authority brought them to that final decision. What brought them to that decision was a thirty minute stay in Roy’s house, a careful investigation, a prolonged interrogation of Roy himself, their observation of Roy and Sharon and the conduct of each, and their common sense judgment based on the apparent fact that Roy was in no danger.
These deputies were peace officers. They had no training in paramedics or emergency medical technology. Their dispatcher sent them on a call from a wife concerning a husband who reportedly had taken an “overdose of pills, had been drinking, was violent.” The anticipated scene was such that the first officer called did not want to go alone. They got to the trailer within minutes of the wife’s call. The scene was quiet; the husband was in bed asleep; the wife was upset; she explained Roy’s drinking, the argument in the car all the way from Cameron to Sweetlake earlier that evening, the struggle over the steering wheel, the pills; she showed them the empty vial, told them of her calls to the hospital and the druggist, and asked them to take Roy to the hospital.
The first arriving deputy went straight to the bedroom where he was told Roy lay asleep. He awakened Roy, first by calling his name, then by shaking him. Both deputies began talking to him. They asked him if he had taken any pills. Coming out of a deep sleep, still groggy, obviously drinking, Roy denied taking any pills. Sharon disputed this in his presence. Still Roy denied it. The deputies offered to take him to the hospital; he refused. They talked to him gently, conversationally. In a few minutes, when he was more awake, he got up, and together they went to the living room where he smoked a cigarette and they talked some more. Roy was making good sense. He said he had taken two antibiotic pills for a cold, and denied taking anything else. The officers again offered to take him to the hospital, but again he refused. The conversation turned to hunting, for Roy had hunting guns visible, and on this subject Roy showed a lively interest. The deputies stayed on awhile, observing Roy. He appeared all right. Sharon had calmed down. The scene looked secure. The officers still did not know whether Roy had swallowed any Darvocets. He insisted he had not. They did not know what to believe. In any event, Roy appeared to be all right and Sharon was subdued, so the deputies prepared to leave. Roy invited them back telling them to stop for coffee the next time they drove by. Before leaving, the deputies assured Sharon if anything else happened, she had but to call them.
*994 Sharon testified that Roy went right to bed, saying to her, “What happens, happens,” that she monitored his sleep (which she said was uncharacteristically quiet, he usually snored), and that both his breathing and his heartbeat were normal. She remembered looking at the clock at 2:30 A.M. Sometime shortly after that, apparently satisfied that he was going to be all right and that there was no reason for her to stay awake any longer, she turned out the light and went to sleep.
On these facts we agree with the jury that the deputies acted reasonably. R.S. 28:53 reads in part:
“A peace officer or a peace officer accompanied by an emergency medical service trained technician may take a person into protective custody and transport him to a treatment facility for a medical evaluation when, as a result of his personal observation, the peace officer or emergency medical technician has reasonable grounds to believe the person is a proper subject for involuntary admission to a treatment facility because the person is acting in a manner dangerous to himself or dangerous to others, is gravely disabled, and is in need of immediate hospitalization to protect such a person or others from physical harm. The person may only be transported to one of the following:
“(a) A community mental health center.
“(b) A public or private general hospital.
“(c) A public or private mental hospital.
“(d) A detoxification center.
“(e) A substance abuse clinic.
“(f) A substance abuse in-patient facility.
“Upon arrival at the treatment facility, the escorting peace officer shall then be relieved of any further responsibility and the person shall be immediately examined by a physician, preferably a psychiatrist, who shall determine if the person shall be voluntarily admitted, admitted by emergency certificate, or discharged.
“In the case of a person suffering from substance abuse and where any of the above facilities are unavailable, the peace officer and emergency medical service technician may use whatever means or facilities available to protect the health and safety of the person suffering from substance abuse until such time as any of the above facilities become available. In taking a person into protective custody the peace officer and emergency medical service technician who acts in compliance with this section is acting in the course of his official duty and cannot be subjected to criminal or civil liability as á result hereof.
“Under the provisions of this act no person shall be placed in protective custody for a period in excess of seventy-two hours. Any person placed in protective custody under the provisions of this act shall be considered as an inmate for maintenance purposes only.”
This statute authorizes a peace officer to take a person into protective custody for a period not in excess of 72 hours when, as a result of his personal observation, the officer has reasonable grounds to believe that one of the listed conditions is present to cause a need for immediate hospitalization, or in the case of a person suffering from substance abuse. The statute gives a peace officer the discretionary authority to take a person into protective custody, provided reasonable grounds for such custody exists. Had the officers taken the deceased into protective custody that night, certainly it could not be disputed that they had reasonable grounds to do so. On the other hand, it is equally indisputable that they had reasonable grounds not to take him into protective custody and transport him to the hospital. Likewise, their decision to leave the house when they did was reasonable; there appeared to be no reason for further alarm. Roy insisted he had not swallowed any harmful pills. He did not look or act like a man who was dangerously ill. Sharon, too, had stopped worrying; she went to sleep, surely believing that *995 there was no reason for her to stay awake and watch Roy.
Even if the deputies had known that they had the authority to take Roy into protective custody without evidence that he had committed a crime, their ultimate decision to leave him where he was justified under all of the circumstances. The jury concluded that the sheriffs office had committed no negligent act leading to Roy’s death, and under the standard of review compelled by Canter v. Koehring, supra, we find no manifest error in that decision.
THE EXPERT TESTIMONY
Three experts testified, Kenneth Katsar-is from Tallahassee, Florida, for plaintiffs; Dean Burke Foster, an assistant professor in the criminal justice program at USL in Lafayette, for defendants; and, Captain George Ambrister, Jr., a police captain in the Acadiana area, who also testified for defendants.
Appellant complains that it was manifest error for the trial jury to have disregarded the testimony of her expert that there was a duty of rescue. This assignment of error is without merit. The trial judge carefully instructed the jury as to the standard of conduct of a rescuer, telling the jury that “a rescuer should not engage in substandard conduct and whether the conduct was reasonable is determined in light of all of the circumstances.” Based on this instruction and the clear testimony, it seems evident that the jury answered the interrogatory regarding the sheriffs negligence with the clear understanding that the sheriff’s negligence was to be evaluated in the context of carrying out a duty of rescue. Since the duty of rescue, as we have indicated earlier, was voluntarily assumed by the sheriff’s office in this case, no real issue is presented on review concerning the existence of such a duty.
Concerning whether the duty was breached, and if so, whether it was the result of substandard conduct, the experts held opposite views. Given the substantive facts in the form of a hypothetical question, Katsaris expressed the view that the deputies should have forceably transported Roy to the hospital. Defendants’ experts just as confidently expressed the opinions that the deputies acted reasonably and in accordance with the appropriate existing standards of professional police conduct, under the same hypothetical facts. No disputes have been raised about the qualifications of the experts who testified. The determination of which expert opinion to accept in the absence of qualification questions is exclusively a determination of the jury. Faustina Pipe Line Co. v. Hebert, 469 So.2d 483 (La.App. 3rd Cir.1982), writ denied 474 So.2d 1295 (La.1985). The jury in this case adopted a view of facts and the expert opinion favorable to the defendants. We find no manifest error in that decision.

The Jury Charges

Appellant objected to certain charges, and argues now that the cumulative effect of these errors amounted to manifest error.
The court gave the jury a charge explaining the law of self-preservation, and appellant argues that this was error. We agree with appellant that this charge was inappropriate in the case. From the evidence, the case viewed in hindsight clearly shows a suicide, although probably resulting from folly rather than intent. We fail to see, however, how the elimination of this common sense instruction from the charges would have affected the jury’s verdict.
The next objection has to do with the charge concerning the right to refuse medical treatment. The trial judge charged the jury that any competent person 18 years of age or over may refuse to consent to medical or surgical treatment as to his own person. That is a correct statement of the law. R.S. 40:1299.56; Ciko v. City of New Orleans, 427 So.2d 80 (La. App. 4th Cir.1983). The trial court did not stop at that, however, but went on to charge the jury as to the substance of R.S. 28:53 quoted above, explaining the authority of the deputies to take a person into protective custody against his will if the circumstances justify it. The trial judge *996 simply and fairly described both sides of the coin by means of these instructions, and did not commit error.
Another objection was leveled at the charge dealing with the law of rescue. Here the trial judge, after defining the law of rescue and the duty of a rescuer, indicated that the standard of care for a peace officer “may be different and may be based upon the expected level of training and skill to which the public is entitled.” Appellant complains that this charge did not tell the jury what that level of training and skill should have been. We fail to see the basis for this argument. In effect, the charge simply left that determination to the jury and was, if anything, beneficial to the appellant.
We have analyzed the entirety of the jury instructions given by the trial court, and we find them to have been generally accurate and thorough. The inappropriateness of the single charge dealing with the law of self-preservation is alone not sufficient to overturn this verdict.
For the foregoing reasons, the judgment of the trial court is affirmed, appellant to pay the costs of this appeal.
AFFIRMED.