liYELVERTON, Judge.
TMs survival and -wrongful death action was brought on behalf of the minor children of Francis L. Mattingly, Jr. Sued were the Town of Church Point, two of its police officers, and the town’s insurer. On the motion of defendants, the trial judge granted an involuntary dismissal at the conclusion of the plaintiffs’ case. They appeal. We affirm.
I2FACTS
The plaintiffs’ deceased, Francis L. Mat-tingly, Jr., was found dead at about 3:45 a.m. on February 3, 1990, on a rural road several miles southwest of Church Point in Acadia Parish. Two Church Point city policemen had driven him in their car to a location close to where he died, and they let him out at that location to walk the short remaining distance to his house. Exactly how he died is unknown. His body, while lying crossways in one lane of travel on the road, was hit by a car driven by a young lady, but he may have been dead before he was hit by that car. A blood alcohol test not long after his death revealed .20 grams percent. He had been drinking beer at a bar in Church Point earlier that night. He was given a ride by the police in response to a citizen’s call. When they picked him up he was standing on the edge of a street in Church Point eating Med chicken from a box. He asked the police to take him home, and they obliged. He lived out in the country. They did not take him all the way home; en route they were called by radio and dispatched back to Church Point for a disturbance at an all-night store. Where they dropped him off had very little traffic compared to where they picked him up. When he got out, he thanked them for the ride. He was dead in less than an hour.
They testified they did not know that he was drunk and saw no evidence of it; he behaved normally. He was talking normally, had no trouble getting in or out of the police car, had no difficulty standing and maintaining his balance, and he walked normally down the shoulder of the road after they let him out. The police officers never smelled alcohol. One said all he smelled was the Med chicken.
Church Point is a peaceful country town. Its police have little experience with violent crimes. The last recollected murder was years before, and nobody could | seven remember an armed robbery. Most of the police work is for disturbance of the peace. Giving rides home is routine.
REASONS FOR JUDGMENT
The trial judge gave the following reasons for judgment:
The officers were doing a favor. They were giving a man a ride home. If he was intoxicated, this fact, if it were a fact, could easily have been not detected by the smell of the Med chicken. The police officer’s duty is to insure public safety. It was reasonable for them to let the deceased off on the shoulder of a rural roadway with ten foot wide shoulders to respond to a call about an ongoing violent crime in process [sic]. The court finds there was no duty owed to plaintiff that was breached by Church Point and will grant the motion for the directed verdict.
INVOLUNTARY DISMISSAL AND STANDARD OF REVIEW
A trial judge may grant a motion for involuntary dismissal as to any party if, after the plaintiff has completed the presentation of his evidence, the judge finds that upon the facts and the law the plaintiff has shown no right to relief. La.Code Civ.P. art. 1672(B). A decision to grant an involuntary dismissal is subject to the manifest error standard of review. Continental Ins. v. Three Seasons Pest Control Co., 94-1094 (La.App. 3 Cir. 2/1/95); 649 So.2d 1220.
DUTY AND BREACH
The duty/risk analysis is appropriate to determine legal responsibility in this type of case. It consists of four inquiries: (1) cause-in-fact, (2) duty, (3) breach, and (4) damages. Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364 (La.1984).
|4The trial judge in this ease made no specific finding as to whether the conduct of the police officers was a cause-in-fact of his *1350 death. The trial judge decided the case finding no duty that was breached.
Once the officers stopped and allowed Mattingly to get in their ear, a duty of care arose. If the officers had taken him off the Church Point street knowing that he was drunk, and if they had undertaken to protect him from the risk of harm caused by being drunk and on the street, then their duty would have been to relocate him to a place reasonably free of that risk of harm. A duty of protection which has been voluntarily assumed must be performed with due care. Harris, 455 So.2d 1364. Stated another way, having undertaken to help him, they were under a duty to do it right. Conner v. American Druggists Ins. Co., 495 So.2d 990 (La.App. 3 Cir.), writ denied, 497 So.2d 1020 (La.1986). The duty of police normally owed to the general public to protect the public, can be transformed into a duty owed to an individual personally, when a one-to-one relationship between them and him is established through closeness and proximity of time. Zeagler v. Town of Jena, 556 So.2d 978 (La. App. 3 Cir.), writ denied 560 So.2d 14 (La. 1990). What limitations there are on this obligation of reasonable care will depend on the circumstances. The duty that would have arisen had they become aware, or should they have become aware, that Mat-tingly was so intoxicated he could not take care of himself, was one thing; quite different was their obligation if they reasonably believed he was not drunk. What duty arose and whether it was breached involves an assessment of the facts and circumstances surrounding the case.
The police in Church Point had a custom of taking anybody home who needed a ride. The police dispatcher testified that between two and three o’clock 15a.m., he got a call from somebody saying that there was a man walking in town in the middle of the road like he was drunk. The location was in the town of Church Point not far from the Cajun Country Bar. He dispatched a patrol car driven by regular patrolman Lucius Mi-nix and accompanied by auxiliary patrolman Ozia Papillion. When Minix and Papillion got there they found Mattingly standing on the side of the street eating from a box of fried chicken. When they stopped, Mattingly told them he did not have a ear and asked if they would take him home. They called the dispatcher and got permission. Mattingly got in the back seat with the box of fried chicken. They drove out of town and out into the country in the direction of the deceased’s house. The trip was uneventful. About fifteen minutes later the dispatcher called them again on the radio, told them about an emergency going on at Junior’s Food Mart in Church Point, and directed them to get back there right away. Then and there they let Mattingly out and drove back to Church Point. Where they let him out was less than a mile from his home.
We assume, as the trial judge apparently did, that there was a relationship between Mattingly’s death and his condition. In hindsight, considering the blood alcohol percentage, he must have been intoxicated. We can assume that his intoxication figured in his death. We can assume that, had the officers taken him all the way home, the risk of harm would have been reduced.
With a blood alcohol percentage as high as his, by most standards he was sufficiently inebriated to be showing signs of it. However, Minix and Papillion testified that he did not appear drunk. He was on the side of the road (not in it) when they picked him up. He was eating fried chicken from a box. He asked them to give him a ride. They agreed. En route he gave them no indication he was intoxicated. Rif there was an odor of alcohol, the fried chicken aroma overpowered it. When he got out of the car, he did so normally. As they drove away, and looked at him in the rearview window, he was walking normally on the shoulder toward his house.
The trial judge believed the officers’ testimony that they did not know that he was drinking. What this finding of fact probably means is that they did not know he had been drinking enough to be dangerous to himself, and that this evaluation was a reasonable one. That being so, they had no duty to take him to a place of complete safety. By this is meant they were not required to tuck him into bed. Their only duty was to exercise ordinary care. When they picked him up, he had intended to walk several miles to his *1351 house. They took him to a point less than one mile from it. They let him out on a highway, but it was less traveled than the street they picked him up from. From all accounts, the reason they took him home was to save him from a long walk and not to protect him from a perceived disability.
The problem with this case is that they let him out so close to his house. Because they let him out so close and did not continue the short distance to his house, which would have taken only a minute or two more of their time, there is a temptation to charge the officers with responsibility for unreasonable conduct. But the temptation is logically insupportable. If he was drunk, he might have wandered back to the highway had they taken him all the way home and left him in front of his house, in his driveway, on his doorsteps, or even inside. If he was not drunk, practically any place would have been a safe place to leave him. The circumstantial evidence consists of an unexplained tragic death of a 24-year old man at 3:45 o’clock in the morning on a little traveled country road. The circumstantial evidence includes a high blood alcohol reading and accounts of beer drinking and pool playing the Reverting before. Just before his death, however, he was eating food and gave no appearance of intoxication. When they picked him up a special relationship was established between the police and the deceased, and they owed him a duty of reasonable care, but at the same time they had an obligation to perform their public duties. Under the circumstances we cannot say that they violated their duty to him by failing to take him all the way home. Under the manifest error standard of review, we find the trial court’s view of the evidence reasonable, and we affirm, at appellants’ costs.
AFFIRMED.